Brau Ramírez, Juez Ponente
*762 TEXTO COMPLETO DE LA SENTENCIA
I
La parte peticionaria, Universidad Central del Caribe (“U.C.C”), solicita la revisión de dos resoluciones emitidas el 7 de julio de 2004 por el Tribunal de Primera Instancia, Sala Superior de Aibonito, en la demanda sobre daños y perjuicios por mala práctica de la medicina instada por las partes demandantes de epígrafe contra el Estado Libre Asociado de Puerto Rico y otras partes.
La demanda está relacionada al fallecimiento del causante de los demandantes, Sr. Jimmy Pérez Berdecía, el 27 de septiembre de 1995, luego de haber recibido tratamiento en varias instituciones de salud.
Según se desprende del recurso, el Sr. Pérez Berdecía sufrió un accidente automovilístico el 24 de septiembre de 1995 en o cerca del municipio de Barranquitas, mientras conducía un vehículo tipo “four track”. Como resultado del accidente, el Sr. Pérez Berdecía, quien no estaba utilizando un casco de protección, sufrió traumas en la cabeza al golpear con la misma la esquina de una acera.
El Sr. Pérez Berdecía fue llevado al Centro de Diagnóstico y Tratamiento del Municipio de Barranquitas, donde llegó con convulsiones. Para esa época, dicho centro era operado por la Corporación de Servicios Integrales de Salud del área de Barranquitas, Comerlo, Corozal, Naranjito y Orocovis, Inc. (“C.S.I.S.”). Dicha corporación había contratado a un médico de apellido Pastrana, quien atendió al Sr. Pérez Berdecía.
Alegadamente, el Dr. Pastrana no tomó las medidas para diagnosticar correctamente la condición del Sr. Pérez Berdecía. En lugar de ésto, decidió referirlo al Hospital Universitario Dr. Ramón Luis Arnau, también conocido como Hospital Regional de Bayamón. Para la fecha de los hechos, dicho Hospital era propiedad y era operado por el E.L.A. La operación de la Sala de Emergencia, sin embargo, había sido subcontratada a la Escuela de Medicina de la peticionaria, U.C.C., la cual había asumido la responsabilidad de prestar servicios médicos en dicha sala. La U.C.C., a su vez, había subcontratado a la corporación Medic Emergencies Specialities (“M.E.S.”) para prestar dichos servicios.
Entre otras condiciones del contrato entre U.C.C. y M.E.S., se requería a esta última mantener una póliza de seguro de responsablidad por daños con límites de $100,000.00 por incidente y $300,000.00 por daños totales agregados. M.E.S. obtuvo una póliza de este tipo de la corporación Reliance Insurance Company of Illinois (“Reliance-lllinois”).
Reliance-lllinois es una de varias compañías afiliadas a Reliance Insurance Company (“Reliance”). Además de Reliance-lllinois, estaban afiliadas a Reliance las siguientes compañías: Reliance National Indemnity Company (“Reliance-Indemnity”), United Pacific Insurance Company (“United Pacific”), Reliance Surety Company (“Reliance-Surety”) y Reliance National Insurance Company (“Reliance-National”).
Además de Reliance-lllinois, hacía negocios en Puerto Rico Reliance-National y posiblemente otras de las corporaciones afiliadas a Reliance.
A la fecha de los hechos, Reliance-lllinois no era un asegurador autorizado para tramitar o contratar seguros en Puerto Rico, dentro del contexto del Código de Seguros de Puerto Rico, ni contribuía al financiamiento de la Asociación de Garantía de Seguros Misceláneos (“la Asociación de Garantías”), creada por Ley para responder en casos de insolvencia, 26 L.P.R.A. sees. 3801 y ss. Reliance-lllinois emitió el seguro en cuestión, sin embargo, como un seguro de líneas excedentes emitido por un asegurador no autorizado, según lo permite el *763 Art. 10.070 del Código de Seguros, 26 L.P.R.A. sec. 1007.
Para esta fecha, Reliance-National era un asegurador autorizado para tramitar y contratar seguros en Puerto Rico y contribuia a la Asociación de Garantías.
Para la fecha de los hechos, M.E.S. había contratado a la Dra. Frances Franceschi para prestar servicios en la Sala de Emergencias del Hospital Regional de Bayamón.
Cuando el Sr. Pérez Beredecía llegó al mencionado Hospital, fue atendido por la Dra. Franceschi. Esta ordenó que se le tomaran placas de la cabeza, las cuales fueron tomadas por un radiólogo del Hospital, el Dr. Berlingeri. La lectura de las placas ofrecida por el Dr. Berlingeri resultó negativa para fracturas. La Dra. Franceschi tampoco diagnosticó que el Sr. Pérez Berdecía tuviera una fractura. Ante esta situación, la Dra. Franceschi optó por enviar al Sr. Pérez a su casa, luego de haberle recetado varios medicamentos. La Dra. Franceschi tomó dicha decisión, a pesar de haber sido informada de que el paciente había tenido convulsiones.
El Sr. Pérez, efectivamente, había sufrido una fractura craneal. Durante la madrugada del 25 de septiembre de 1995, el Sr. Pérez desarrolló nuevas convulsiones y fue llevado de emergencia al C.D.T. de Barranquitas, donde había sido atendido el día anterior. En esta ocasión fue referido al Hospital Menonita de Aibonito. El Sr. Pérez Beredecía sufrió un arresto cardíaco en el Hospital Menonita de Aibonito. Fue entubado y trasladado por helicóptero al Centro Médico de Río Piedras, donde llegó en estado comatoso. El Sr. Pérez Beredecía nunca recuperó el conocimiento. Falleció pocos días después, el 27 de septiembre de 1995.
Los padres del Sr. Pérez, Euclides Pérez Matos y María Berdecía, y la esposa e hijo de éste, Karen Borges y Jan Cario Pérez Borges procedieron a instar demandas separadas por daños y perjuicios por impericia de la medicina ante el Tribunal de Primera Instancia, Sala Superior de Aibonito, contra el E.L.A., el Municipio de Barranquitas, la corporación C.S.I.S., y el Hospital Menonita, alegando que la muerte del Sr. Pérez Berdecía se había debido a la negligencia de los médicos que lo habían atendido en las distintas facilidades de salud en los días 24 y 25 de septiembre de 1995 al no detectar y atender la fractura craneal del paciente. Los familiares del Sr. Pérez Beredecía solicitaron compensación por los daños sufridos por ellos.
Las partes demandadas contestaron la demanda, negando las alegaciones.
Oportunamente, los pleitos fueron consolidados.
Posteriormente, el E.L.A. presentó una demanda contra tercero contra la U.C.C. para que dicha parte le respondiera al E.L.A. y/o a los demandantes por los daños ocasionados.
La U.C.C., a su vez, presentó una demanda contra tercero contra M.E.S., la Dra. Franceschi y contra Reliance-Illinois, para que dichas partes le respondieran a U.C.C. por cualquier cantidad que ésta tuviera que desembolsar. La U.C.C. también presentó una reconvención contra el E.L.A.
La corporación C.S.I.S. presentó una demanda contra tercero contar el Dr. Pastrana y una demanda contra coparte contra M.E.S.
La Dra. Franceschi presentó una reconvención contra U.C.C. y una demanda contra tercero contra el Dr. Berlingeri.
Las partes contestaron las distintas alegaciones.
M.E.S. y Reliance-Illinois comparecieron representados por los abogados contratados por esta última, *764 quienes participaron activamente en el descubrimiento de prueba del caso.
Durante la pendencia de los procedimientos, Reliance-Illinois se fusionó con Reliance-National. Como consecuencia de dicha fusión, Reliance-Illinois desapareció y sus activos quedaron incorporados a Reliance-National.
Según hemos indicado, a diferencia de Reliance-Illinois, Reliance-National era una entidad autorizada para tramitar y emitir pólizas de seguros en Puerto Rico y contribuía al pago requerido para la Asociación de Garantías.
Luego de numerosos incidentes procesales, el 29 de mayo de 2001, el Comisionado de Seguros del Estado de Pennsylvania presentó un procedimiento ante los tribunales de ese estado para intervenir a Reliance y a las otras compañías afiliadas, incluyendo Reliance-National y Reliance-Illinois, de conformidad con las leyes de dicha jurisdicción. El Tribunal de Pennsylvania ordenó la paralización de todas las acciones judiciales contra las corporaciones envueltas en el procedimiento.
El 28 de junio de 2001, M.E.S. y Reliance-Illinois informaron al Tribunal de Primera Instancia de lo anterior y solicitaron la paralización de los procedimientos contra dichas partes, conforme a las disposiciones equivalentes del Código de Seguros de Puerto Rico, 26 L.P.R.A. sees. 4001 y ss.
El Tribunal ordenó la paralización de los procedimientos.
Posteriormente, se informó que el Comisionado de Seguros de Pennsylvania había solicitado la liquidación de Reliance y las otras compañías afiliadas.
El 14 de marzo de 2002, la U.C.C. informó que había presentado el correspondiente formulario de comprobación de pérdida contra M.E.S. y Reliance-Illinois.
Los procedimientos permanecieron paralizados hasta el 10 de mayo de 2002.
Poco después, en julio de 2002, la Asociación de Garantías compareció ante el Tribunal de Primera Instancia y anunció que habría de asumir la representación de M.E.S. y de la compañía aseguradora de ésta, en su capacidad como garantizadora de las obligaciones de Reliance-National. El Tribunal acogió dicha representación. No surge que, en ese momento, la Asociación hubiera expresado objeción o defensa alguna a dicha responsabilidad.
Pocas semanas después, el 25 de septiembre de 2002, la Asociación de Garantías solicitó ser relevada de su representación, alegando que el seguro en el caso de autos había sido emitido por Reliance-Illinois, antes de la fusión de dicha compañía con Reliance-National, y no por esta última, por lo que la Asociación de Garantía no venía a responder por la deuda. El Tribunal concedió la renuncia.
Posteriormente, U.C.C. planteó al Tribunal que entendía que la Asociación de Garantías venía obligada a brindar representación a M.E.S. y a responder por la póliza expedida por Reliance-Illinois. La U.C.C. solicitó al Tribunal que se ordenara a la Asociación de Garantías y al Comisionado de Seguros de Puerto Rico comparecer y explicar su negativa a realizar lo anterior.
El 15 de enero de 2004, las partes en el caso presentaron un informe de conferencia preliminar entre abogados. M.E.S. no compareció en el mismo, ya que se encontraba sin representación profesional.
Luego de otros incidentes, el 1 de abril de 2004, la Asociación de Garantías compareció al Tribunal, *765 explicando su posición. En su comparecencia, la Asociación expresó, entre otras cosas:

“[U]n asegurador de líneas excedentes, como lo es [Reliance-Illinois], no cualifica como un asegurador insolvente, por no ser un asegurador autorizado en Puerto Rico. Tampoco es un asegurador miembro [de la Asociación de Garantías], puesto que no es un asegurador autorizado para tramitar seguros en Puerto Rico, ni suscribe las clases de seguro a las cuales aplica el Capítulo 38 del Código de Seguros de Puerto Rico. En síntesis, tampoco paga las derramas para ser miembro de la Asociación de Garantías, por lo que no puede participar en sus beneficios. ”

Asimismo, existe otra razón por la cual no existe cubierta. El hecho de que se haya fusionado dicho asegurador (de líneas excedentes) con otro autorizado, no significa que la Asociación de Garantías de Seguros Misceláneos de Puerto Rico tenga que cubrir esta reclamación, toda vez que el asegurador no autorizado desapareció con la fusión.
Cuando se fusionan dos aseguradores, sobrevive uno y desaparece el otro. Si luego de la fusión ocurre la insolvencia, el que quedó insolvente es el asegurador que sobrevivió la fusión. El que desapareció en la fusión, no existe jurídicamente cuando ocurre la insolvencia. Por lo tanto, las pólizas que fueron emitidas por el asegurador insolvente que desapareció en la fusión, no fueron técnicamente emitidas por el asegurador insolvente. Por consiguiente, si se interpreta literalmente la ley, las reclamaciones bajo las pólizas emitidas por el asegurador que desapareció en la fusión, no estarían cubiertas por no haber sido emitidas por el asegurador insolvente.
En el caso que nos ocupa, se fusionó Reliance Insurance Company (asegurador autorizado) con Reliance Insurance of Illinois (asegurador líneas excedentes) y sobrevivió el asegurador autorizado. En esos casos, el asegurador de líneas excedentes desaparece en la fusión, y el riesgo asegurado por la póliza ocurrió antes de la fusión; por lo tanto no existe obligación de cubierta por la Asociación de Garantías de Seguros Misceláneos.
La U.C.C. Replicó a la comparecencia de la Asociación de Garantías, alegando que dicha parte tenía la obligación de continuar brindando representación a M.E.S., en sustitución de Reliance-Illinois, según lo había asumido anteriormente e insistiendo en que el Tribunal debía reconsiderar su orden de relevo de representación.
El 4 de mayo de 2004, el Tribunal de Primera Instancia aprobó el informe sobre conferencia preliminar entre abogados presentado por las partes el 15 de enero de 2004. La U.C.C. solicitó reconsideración de dicho dictamen, expresando que M.E.S. no gozaba de representación en el caso.
Luego de otros incidentes, el 7 de julio de 2004, el Tribunal emitió las resoluciones recurridas, denegando la solicitud de la U.C.C. para que se ordenara a la Asociación de Garantías continuar brindando representación a M.E.S., en sustitución de Reliance-Illinois y la moción de reconsideración de la U.C.C. en tomo a la aprobación del informe de conferencia preliminar.
En su resolución, el Tribunal expresó, entre otras cosas, que cualquier planteamiento sobre el incumplimiento del contrato debía ventilarse mediante un pleito independiente, expresando que “[e]stos casos datan del 1996 y no pueden continuar dilatándose ”.
Insatisfecha, la U.C.C. acudió ante este Tribunal.
II
En su recurso, la U.C.C. plantea que el Tribunal de Primera Instancia erró al denegar su petición para que se ordenara a la Asociación de Garantías continuar representando a M.E.S., a pesar de que dicha parte tenía una póliza de seguro válidamente expedida por Reliance-Illinois. La U.C.C. señala que aunque Reliance-Illinois *766 había emitido dicha póliza como un seguro excedente por un asegurador no autorizado, dicha corporación posteriormente se había fusionado con Reliance-National, la que sí era miembro de la Asociación de Garantías, asumiendo esta última todas las obligaciones de Reliance-Illinois, incluyendo el pago de la póliza en cuestión. La U.C.C. plantea que el Tribunal erró al aprobar el informe sobre conferencia preliminar sin que M.E.S. hubiera estado debidamente representada en el caso.
La industria del seguro en Puerto Rico, según se conoce, es objeto de una minuciosa reglamentación por parte del Gobierno, dirigida a proteger a los consumidores que reciben servicios por parte de esta industria. Assoc. Ins. Agencies, Inc. v. Com. Seg. P.R., 144 D.P.R. 425, 442 (1997).
Entre otros aspectos reglamentados por la ley, el Código de Seguros de Puerto Rico establece un detallado procedimiento para gobernar la disposición de las reclamaciones contra aseguradores insolventes. A.I.I.Co. v. Seg. San Miguel, 161 D.P.R. _ (2004), 2004 J.T.S. 58, a la pág. 871; Ruiz v. New York Dept. Stores, 146 D.P. R. 353 368-372 (1996); Intaco Equipment Corp. v. Arelis Const., 142 D.P.R. 648, 650-652 (1997); Com. de Seguros v. Lebrón Román, 138 D.P.R. 533, 537-541 (1995); Asoc. de Garantías v. Commonwealth Ins. Co., 114 D.P.R. 166, 173 (1983); Calderón, Etc. v. The Commonwealth Ins. Co., 111 D.P.R. 153, 154 (1981); Com. de Seguros v. Builders Ins. Co., 108 D.P.R. 625, 627 (1979); Acevedo v. Plaza Las Américas, Inc., 108 D.P.R. 361, 364-365 (1979); Caribbean Insurance Co. v. Tribunal Superior, 98 D.P.R. 919, 922-923 (1970); 26 L.P.R.A. secs. 4001 y ss.
La Ley Núm. 72 de 17 de agosto de 1991 estableció, además, la Asociación de Garantías de Seguros Misceláneos de Puerto Rico, 26 L.P.R.A. sees. 3801 y ss. Se trata de un mecanismo para el pago de reclamaciones cubiertas bajo determinadas pólizas de seguro, con el fin de evitar pérdidas financieras a los reclamantes o tenedores de pólizas de un asegurador que hubiese advenido insolvente. Montañez v. U.P.R., 156 D.P.R. _ (2002), 2002 J.T.S. 40, a la pág. 852; Ruiz v. New York Dept. Stores, 146 D.P.R. a la pág. 372; A.A.A. v. Librotex, Inc., 141 D.P.R. 375, 381 (1996); véase, además, A.A.A. v. Builders Ins. Co., etc., 115 D.P.R. 57, 61 (1984); Aponte Sutton v. P.R. Tel. Co., 110 D.P.R. 650, 651-652 (1981); Com. de Seguros v. Builders Ins. Co., 108 D.P.R. a la pág. 627; 26 L.P.R.A. sec. 3802.
La Asociación de Garantías es una entidad compulsoria, compuesta por todos los aseguradores autorizados a tramitar toda clase de seguros en Puerto Rico, excepto aquéllos expresamente excluidos por la Ley. Montañez v. U.P.R., 2002 J.T.S. 40, a la pág. 856. A los aseguradores concernidos se les exige pertenecer a la Asociación de Garantías, como condición para contratar seguros en Puerto Rico. Montañez v. U.P.R., 2002 J.T.S. 40, a la pág. 856; 26 L.P.R.A. see. 3806.
Se trata de una entidad con carácter sin fines de lucro. 26 L.P.R.A. see. 3806.
Dados sus fines, la legislación relacionada a la Asociación de Garantías se interpreta liberalmente para lograr el propósito perseguido. Montañez v. U.P.R., 2002 J.T.S. 40, a la pág. 852; 26 L.P.R.A. see. 3804.
La Asociación de Garantías recibe sus fondos del pago de derramas realizadas por las aseguradoras que hacen negocios en Puerto Rico. Estas derramas son recobradas de los tenedores de la póliza. 26 L.P.R.A. see. 3816.
La Asociación de Garantías sustituye, sujeto a las limitaciones que la ley le impone, al asegurador insolvente. Montañez v. U.P.R., 2002 J.T.S. 40, a la pág. 856.
Ahora bien, la Asociación de Garantías sólo viene obligada a cubrir aquellas reclamaciones cubiertas por la Ley, 26 L.P.R.A. sec. (a)(1), según definidas por el estatuto, 26 L.P.R.A. see. 3805, inciso (6).
*767 La Ley aclara que el asegurador miembro de la Asociación de Garantías es aquél “autorizado para tramitar seguros en Puerto Rico y que suscriba las clases de seguros cubiertos por el estatuto26 L.P.R.A. see. 3805, inciso (8).
Similarmente, la Ley define “asegurador insolvente” de la siguiente manera:

“Significa un asegurador autorizado para tramitar o contratar seguros en Puerto Rico, bien a la fecha en que se emitió la póliza o cuando ocurrió el suceso asegurado, y contra quien un tribunal con jurisdicción competente ha emitido en el estado de domicilio del asegurador o en Puerto Rico una orden final de liquidación basada en su insolvencia y de conformidad con la see. 4015 de este título y la misma no ha sido paralizada ni objeto de un supersedeas o de otra orden comparable. ”

26 L.P.R.A. see. 3805, inciso (7).
En el presente caso, no existe controversia que se ha emitido una orden de liquidación contra Reliance y contra sus compañías afiliadas, incluyendo Reliance-Illinois y Reliance-National. En vista de ello, la Asociación de Garantías compareció ante el Tribunal y asumió la representación de M.E.S., en cumplimiento de las obligaciones existentes bajo la póliza emitida a favor de M.E.S. El Tribunal de Primera Instancia admitió esta representación el 30 de julio de 2002.
Posteriormente, sin embargo, la Asociación de Garantías solicitó ser relevada de dicha representación, alegando que la póliza emitida por Reliance-Illinois había sido en calidad de seguro por líneas excedentes, por lo que la misma no estaba cubierta por el mecanismo dispuesto por ley.
En efecto, el Tribunal Supremo de Puerto Rico ha aclarado que, aunque no están propiamente definidos por ley, los seguros de líneas excedentes son aquéllos que no pueden ser obtenidos en todo o en parte de aseguradores autorizados. Este tipo de seguros tiene el propósito de ofrecer protección a aquellos individuos o entidades que por diversas razones estarían de otro modo imposibilitados de obtener seguros con aseguradores autorizados. Com. Seguros v. Prime Life, 162 D.P.R. _ (2004), 2004 J.T.S. 105, a la pág. 1,255.
El Art. 10.070 el Código de Seguros dispone, en cuanto a este asunto:

“Cualquier parte o la totalidad de una cubierta de seguro que no pueda obtenerse de aseguradores autorizados, cubierta que en adelante se designará en este título como “seguros de líneas excedentes podrá obtenerse de aseguradores no autorizados, siempre que:

“(1) El seguro no pueda obtenerse de aseguradores autorizados, o ha sido obtenido hasta el máximo que dichos aseguradores autorizados están dispuestos a asegurar;...; y

(2) Dicho seguro se obtenga mediante un corredor autorizado de seguros de líneas excedentes, ...; y

(3) El seguro con un asegurador no autorizado no se procure o requiera con el fin de obtener ventajas, bien en cuanto al tipo de primas, o en cuanto a los términos del contrato de seguros;.., (y)

(4) El seguro se obtenga de aseguradores no autorizados elegibles con arreglo a la sec. 1007a de este título.

El inciso (1) no aplica si la cubierta de seguro ofrecida por un asegurador autorizado para cubrir el riesgo de impericia profesional médico-hospitalaria no constituye la cubierta mínima necesaria para conseguir una póliza de exceso en el mercado de líneas excedentes, en cuyo caso, el corredor de líneas excedentes podrá 
*768
descartar la cubierta primaria ofrecida por el asegurador autorizado y acudir al mercado de líneas excedentes para obtener la cubierta necesaria. ”

26 L.P.R.A. see. 1007 (Supl. 2004).
El Art. 10.071 del Código de Seguros, 26 L.P.R.A. sec. 1007a, establece numerosos requisitos para que un asegurador pueda ser elegible para tramitar contratos de seguros de líneas excedentes.
Se requiere que el asegurador no autorizado solicite por escrito al Comisionado de Seguros, a través de un corredor de líneas excedentes que tenga licencia como tal, que se le acredite como un asegurador elegible para tramitar este tipo de seguros. 26 L.P.R.A. sec. 1007a(l)(a). El asegurador viene obligado a presentar evidencia satisfactoria de que es un asegurador autorizado en el Estado o país de su domicilio para la clase o clases de seguro que se propone contratar de ese modo en Puerto Rico y que ha sido tal asegurador por un término no menor de 5 años inmediatamente anteriores a la solicitud, o deberá ser una subsidiaria poseída totalmente por un asegurador autorizado en Puerto Rico o un asegurador elegible, que haya gozado de dicha elegibilidad por un término no menor de 5 años inmediatamente anteriores. 26 L.P.R.A. sec. 1007a(l)(b).
Debe tratarse de una entidad que goce de buena reputación y que preste servicios con razonable prontitud a sus tenedores de pólizas con relación al pago de pérdidas y reclamaciones justas. 26 L.P.R.A. sec. 1007a(l)(e).
El asegurador no autorizado viene obligado a presentar ante el Comisionado una copia debidamente autenticada de su estado anual de situación financiera más reciente, con los valores monetarios y conteniendo cualquier otra información adicional que el Comisionado pueda requerir. 26 L.P.R.A. sec. 1007a(I)(c). Se le exige tener un excedente para tenedores de póliza no menor que la cantidad que requiere el Código de Seguros de Puerto Rico para un asegurador autorizado de igual clase, y si fuere un asegurador extranjero no incorporado en los Estados Unidos, debe depositar ante el Departamento de Hacienda una suma no menor de $50,000.00, “para la protección de todos los tenedores de pólizas y acreedores del mencionado asegurador extranjero en Puerto Rico”. 26 L.P.R.A. sec. 1007a(l)(d).
La Ley permite que cuando un riesgo en particular de seguro de líneas excedentes no pueda asegurarse total o parcialmente con los aseguradores elegibles de líneas excedentes, el corredor pueda presentar un affidávit suplementario exponiendo los hechos que justifican que se obtenga un seguro de este tipo con otro asegurador. 26 L.P.R.A. sec. 1007a(4). En estos casos, el asegurador no elegible deberá depositar la suma de $20,000.00 con el Departamento de Hacienda, para beneficio de los acreedores y tenedores de póliza. Id.
La Ley dispone que:

“Los contratos de seguro obtenido como cubierta de líneas excedentes de aseguradores no autorizados, de acuerdo con este Capítulo, serán completamente válidos y exigiblejs] en cuanto a todas las partes, y se reconocerán en todo asunto y respecto, y para todos los propósitos, con el mismo efecto que contratos análogos concertados por aseguradores autorizados. En cuanto a cualquiera de dichos contratos, el asegurador se considerará como asegurador autorizado en Puerto Rico, pero sólo estará sujeto a las disposiciones de este Capítulo. ”

26L.P.R.A. sec. 1010.
La Asociación de Garantías, según hemos visto, planteó ante el Tribunal de Primera Instancia que, toda vez que la póliza emitida por Reliance-Illinois a favor de M.E.S. fue una póliza de líneas excedentes, la misma no está cubierta por la Ley Núm. 72 de 17 de agosto de 1991, que creó la Asociación de Garantías, por lo que dicha entidad no tiene responsabilidad alguna por la misma. El Tribunal de Primera Instancia así lo entendió y relevó *769 a la Asociación de Garantías de su representación de M.E.S.
La U.C.C. plantea que dicha determinación fue errónea porque a la fecha en que se produjo la insolvencia de Reliance-IHinois, dicha corporación se había fusionado con Reliance-National, la cual sí era una aseguradora autorizada en Puerto Rico y, por lo tanto, cubierta por la Asociación de Garantía.
La norma es que el procedimiento y las consecuencias de las fusiones (“mergers”) de compañías de seguro es el mismo que para cualquier otro tipo de corporación. Véase, Lee R. Russ, Couch On Insurance 3d, Vol. 1, West Group, 1997, pág. 5-3; Eric Mills Holmes & L. Anthony Sutin, Holmes’ Appleman on Insurance 2d, Vol. 14, Lexis Publishing, 2000, pág. 745.
En estos casos, según dispone el Art. 10.09 de la Ley de Corporaciones de Puerto Rico, se extingue la personalidad jurídica aislada de todas las corporaciones constituyentes que fueren parte en el acuerdo, “salvo la de la que hubiere absorbido por fusión a la otra u otras, según sea el casó”. 14 L.P.R.A. see. 3059. El precepto añade, en lo pertinente que:

“Todas las deudas, obligaciones y deberes de las respectivas corporaciones constituyentes serán en adelante deudas, obligaciones y deberes de la corporación que se origine por la consolidación o que subsista a la fusión, y le serán exigióles como si tales deudas obligaciones y deberes hubieran sido contraídos por ésta. ”

14 L.P.R.A. see. 3059.
Esta es la norma vigente en Pennsylvania, donde se presentó el proceso de insolvencia contra Reliance y las otras compañías. Véase, 15 Pa.C.S.A. sec. 8959(b) (“All the property, real, personal and mixed, of each of the companies parties to the merger or consolidation, and all debts due on whatever account to any of them, as well as other things and causes of action belonging to any of them, shall be deemed to be vested in and shall belong to the surviving or new company, as the case may be, without further action,... . The surviving or new company shall thenceforth be responsible for all liabilities of each of the companies so merged or consolidated. ...”).
También es la norma general en el derecho de corporaciones. Véase, William Meade Fletcher et ais., Fletcher Cyclopedia of Corporations, Vol. 15, West Group, 1999 Rev. Vol., a las págs. 115-116 (“[w]hen corporations merge, the surviving corporation succeeds to both the rights and obligations of the constituent corporations”); 19 Am. Jur. 2d, Corporations, sec. 2715, págs. 526-527 (1986) (“[g]enerally speaking, where a corporation succeeds to the assets of another corporation by virtue of a merger or consolidation and not by way of purchase, the new or resulting corporation is liable for the debts and contracts of the other corporation, whether they rise ex contractu or ex delicto, although there is no statute imposing liability and no agreement assuming it”).
En el presente caso, al ocurrir la fusión de Reliance-Illinois con Reliance-National, las deudas de la primera se convirtieron en deudas de Reliance-National. Esto incluye las responsabilidades de Reliance-Illinois bajo las pólizas emitidas por ésta.
Siendo Reliance-National una aseguradora autorizada y, por tanto, cubierta por la Asociación de Garantías, al advenir insolvente Reliance-National, la Asociación de Garantías viene legalmente obligada a sustituir a la compañía aseguradora. 26 L.P.R.A. see. 3802; Montañez v. U.P.R., 2002 J.T.S. 40, a la pág. 852; Ruiz v. New York Dept. Stores, 146 D.P.R. a la pág. 372; A.A.A. v. Librotex, Inc., 141 D.P.R. a la pág. 381; Aponte Sutton v. P.R. Tel. Co., 110 D.P.R. a las págs. 651-652; Com. de Seguros v. Builders Ins. Co., 108 D.P.R. a la pág. 627.
Debe recordarse que la legislación relacionada a la Asociación de Garantías se interpreta liberalmente para lograr el propósito perseguido por el estatuto, que no es otro que proteger a las consumidores que han adquirido *770 pólizas de aseguradores que se han tomado insolventes. Montañez v. U.P.R., 2002 J.T.S. 40, a la pág. 852; 26 L.P.R.A. see. 3804.
En el caso de autos, somos de la opinión que el Tribunal de Primera Instancia erró al relevar de su representación a la Asociación de Garantías. Habiendo comparecido voluntariamente dicha entidad al litigio y participado en los procedimientos en sustitución de Reliance-Illinois, sin levantar objeción, el Tribunal de Primera Instancia no la debió de haber relevado de su representación. Cf., Eric Mills Holmes & L. Anthony Sutin, Holmes’ Appleman on Insurance 2d, Vol. 2, Lexis Publishing, 1996, pág. 345.
Debe recordarse que el deber del asegurador de defender a su asegurado se interpreta expansivamente a favor de este último. El mismo se determina a base de las meras alegaciones de la demanda y es independiente del resultado final del pleito. Pagán Caraballo v. Silva, Ortiz, 122 D.P.R. 105, 110-112 (1988); Vega v. Pepsi-Cola Bottling Co., 118 D.P.R. 661, 665-666 (1); Morales Garay v. Roldán, 110 D.P.R. 701, 706-708 (1981); Boston Old Colony Insurance Company v. Tribunal Superior, 104 D.P.R. 517, 520-521 (1975); Fernández v. Royal Indemnity Co., 87 D.P.R. 859, 863-864 (1963).
En este caso, la reclamación presentada está claramente comprendida por la póliza emitida a favor de M.E. S. Ante la insolvencia de la compañía aseguradora, la Asociación de Garantías tiene la obligación de proveer defensa a dicha parte en el litigio.
Por los fundamentos expresados, se expide el auto solicitado y se revoca la resolución recurrida. En su lugar, se deja sin efecto la resolución del Tribunal de Primera Instancia que relevó a la Asociación de Garantías de su representación de M.E.S. en este caso. Se devolverá el asunto al Tribunal de Primera Instancia para procedimientos consistentes con esta sentencia.
Lo pronunció y lo manda el Tribunal y lo certifica la Secretaria del Tribunal de Apelaciones.
Aida Ileana Oquendo Graulau
Secretaria General